Council, you may proceed. Thank you, Your Honor. Good morning and may it please the Court. Robert Ellman for the United States. This is a government appeal which follows an extensive investigation resulting ultimately in the suppression of a great deal of material evidence notwithstanding a high degree of professionalism and diligence on the part of agents from various different agencies who are participating in the investigation. Quick onset question. How did the case get to Nevada? The headquarters is in California and the headquarters is in Westlake Village, California, but many of the frauds occurred in Las Vegas. Okay. And it was indicted there? Yes, it was. Okay. The case presents three issues. The first is whether the individual defendants in this case can vicariously assert the corporation's interest in the Fourth Amendment expectation of privacy. The overriding consideration there, I think, to be kept in mind throughout the analysis is that the Fourth Amendment protects persons, not places, and that's why the burden is on the defendants to establish an objectively reasonable personal privacy interest in the items that were seized here. How does this case differ from Gonzales and Lefkowitz in that regard? Well, Gonzales is a small family-run business which at its peak had approximately 25 employees, SDI. How many employees did the location where the search occurred, how many employees there? It was between 40 and 50, and SDI additionally So 25 is small, but 40 and 50 is big? Well, 40 to 50 on-site, Your Honor, but there were hundreds of additional SDI employees throughout the United States. What else distinguishes this case from Gonzales and Lefkowitz? Gonzales was a wiretap case, and the information that was seized was information in telephone conversations. Here, you're It doesn't include any telephone conversations, and there was no wiretap. So the type of information seized is also quite different. What is that? What difference does that make with respect to constitutional standing? Well, the Supreme Court has said, and I refer you to Katz specifically, that a person necessarily has a privacy interest in a telephone conversation. Someone does not expect anyone else to be listening. With respect to the documents seized here, most of them were prepared with disclosure to third parties in mind or in response to inquiries from third parties. They were billing, for example, to insurance companies, correspondence with doctors, correspondence with cardiac diagnostic companies, et cetera. So there is a significant qualitative difference in the type of information as well. So you have that in addition to the fact that Gonzales was a significantly smaller and, I might add, family-run business, unlike SDI. What about Lefkowitz? Lefkowitz is a pre-pedia case where you have, I believe, three agents of the government who are sharing an office suite. It's considerably smaller than SDI and considerably more intimate. He wasn't even an officer of the corporation, right? I don't – I thought Lefkowitz was not a corporation case. Am I wrong, Your Honor? I'm looking at footnote 2 on page 1316 of Lefkowitz, and the footnote starts out, the government here renews its argument, unsuccessful below, that Lefkowitz lacked standing to challenge the search of his corporate offices. The government correctly notes that Lefkowitz does not have standing merely because he was a corporate officer, and then it goes on to say, the Court nevertheless found that Lefkowitz had, quote, a sufficient proprietary interest in the suite, which was the target of the search, and where corporate records were searched to impart standing. This finding is amply supported in the record. All right. I was a corporation. He was not an officer, but he had standing. I thought he was an officer, but that alone doesn't get you anywhere. Well, the cases say that a proprietary interest alone doesn't get you there, and being a corporate officer doesn't alone get you there. And the footnote in Lefkowitz offers really no analysis at all. It simply says there's a sufficient proprietary interest. But the cases, including Padilla, make clear that a proprietary interest alone doesn't get you there. So I don't think there's enough in Lefkowitz, frankly, to latch on to, to shed any light on to whether these individual defendants had standing or not. Together, they owned about 60 percent of the company, right? I believe that's correct. In order to determine whether there was standing, you really – it's a fairly fact-intensive inquiry, but it requires you to look not only at the type of items, but the setting in which these items were found. And the documents here, for the most part, have nothing to do with the individual defendants personally. They weren't created by them. They weren't created for them. And in most instances, they were never even seen by them. Does the government concede that there might be some standing as to certain of these records, or is it all or nothing? It's not entirely all or nothing, no, Your Honor. And as these items were seized, they were brought to a seizing agent and inventoried. And it's the government's position that there is at least, arguably, an individual privacy interest under the Fourth Amendment in documents that were seized from the private offices of the two individual defendants, and those can be segregated. Are there any other areas of the company related to their particular functions that you would also agree would put it within the ambit of their privacy? Not on this record, Your Honor. In fact, the company was designed – the company's headquarters was designed in a sort of bullpen configuration with offices on the outside. Within the bullpen, where the vast majority of the employees worked, they were open cubicles and there were unlocked files. So there's really nothing to indicate that there was any either subjective or objective expectation of privacy in the materials. And that, again, is the vast majority of materials seized here. In the wake of the Padilla case, joint supervision and control no longer suffices for establishing a Fourth Amendment privacy interest. And that's particularly true where there's disclosure to third parties, as we have here. And I refer you again to the Miller case and the Cormier case in the reply brief at page 11. And this order conferred unqualified standing on all of the records at the headquarters. Under Takeda, there's a distinct difference between an expectation of privacy in a commercial premises, such as this, and in a residential premises. And what Takeda says is in the employment context, the reasonable expectation of privacy is only found to exist in an area given over to an employee's exclusive use. And that goes back to the question that you had asked, Judge O'Scanlan, about whether some subset of these might be amenable to the standing arguments. And again, what is in the private offices of the individual defendants may well fit within that. And I'd like to conclude analysis of standing with just that quote from Marshall, which we put in the brief. What employees observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy. And again, these are documents prepared by employees, never even seen by the individual defendants, and for the most part, prepared for use or review by off-site third parties. Now, the breadth of the warrant and the incorporation of the affidavit into the warrant are addressed at length in the brief. So what I would like to do is move right to the good faith argument and then revisit probable cause at the end. Now, the magistrate found that certain portions were within the warrant, but certain were not, but the, but Judge Pro threw them all out. Correct. Now, what is your argument with respect to what the magistrate found? Not what Judge Pro found, but what the magistrate found? Well, it's our argument that the magistrate analyzed the question erroneously. The warrant is admittedly broad. It contains 24 categories, some of which are broader than others. The magistrate appears to have looked at the warrant, deemed it to be overbroad without considering probable cause, and then went right to incorporation for purposes of trying to find a way to cure the warrant. But it has always been the government's position that the warrant is not defective in the first instance, so it was unnecessary to look to the affidavit. The magistrate concluded that if the affidavit had been incorporated into the warrant, then there was probably, it would probably be sufficient as to all categories. So we've taken issue with the magistrate's incorporation conclusion, and perhaps I should simply address that next. Before you go there, this really goes to how you look at it. With respect to the district court, I thought that your complaint was that he was looking at particularity. I'm sorry? I thought with respect to the district court, your complaint was that, in effect, he was looking at particularity under the lens of overbreadth. Is that correct? I think that's true, and actually the problem is that there was a conflation of the two. As opposed to seeing whether the warrant is overbroad and then seeing whether the item, whether you can figure out what the item is or is not, is the particularity, but he was merging the two? Correct. Even the broadestly worded warrant could be supported by probable cause, but that takes an analysis of what information was before the magistrate. In fact, at one end of that continuum, you have a corporation that's permeated with fraud, and under the 50 States case, all that warrant has to say is documents related to the business of the defendant. And then on the other end of the case But we're not dealing with a permeated with fraud warrant. We're not, Your Honor, although the government did make that contention below. And I only bring that up because on this continuum, this case is much closer to the permeated with fraud end of the continuum than it is to the other end, which would be a very narrow search for. But that's not on the plate here. Permeated with fraud is not. But the world of probable cause is found along this continuum. Didn't the magistrate find that in several important respects the affidavit was misleading or false? I don't believe so, Your Honor. May I ask what you're referring to? Yeah. Didn't the magistrate find that the agent's assertion that many patients did not need sleep studies was inaccurate? Page 33. Page 33 of the excerpts? Page 33 of the magistrate's report. Perhaps you can ‑‑ I found the page, Your Honor. Maybe you can point me to the part of the text that concerns you. The Court agrees with defendant's argument that this is line 21 on page 33. The Court agrees with defendant's assertion that Mrs. Berlinger, Ms. Berlinger's opinion that many patients did not need sleep studies was not supported by a reliable foundation. I can't find that. Is that page 33? Of the report and recommendation? Yeah. I'm looking at document 101, Your Honor. I'm not finding that passage. Is page 238 of the record? That's the page I'm on. It appears in several places, yeah. Page 230 of the report and recommendation, yeah. I'm sorry about the confusion, Your Honor, but I'm looking at page 238 and not seeing it, which is page 33 of the magistrate's report and recommendation. Apparently, that's not the page you're looking at. Yeah. This is page 33 of the findings and recommendations regarding defendant's motion for Frank's hearing. Okay. I'm ‑‑ Frank's hearing? Yeah. I was looking at the findings and recommendations on the suppression motion. Okay. Okay. And it sounds like there was a ‑‑ from what you just read to me, there was at least one area where the magistrate discredited a portion of the evidence that the government had presented, but this is a warrant that contains 24 different categories, and I think at worst, assuming that the magistrate simply disbelieved the government's evidence on that point, there would still be probable cause as to most of these documents, so the ruling would still be erroneous. Incorporation is viewed in two different ways. Under vesicuru, there's a functional approach, and the court has rejected what it calls the magic words approach, and what the court stated is that the warrant is effectively all of the documents that the agents rely on, and here, that clearly did include the affidavit because the testimony is that the agents were given copies of this affidavit and that copies were also brought to the search. There was a two and a half hour pre‑search briefing conducted by Special Agent Raftery, which concentrated on the affidavit and the particulars thereof. Somebody in the course of this testifies, swear, whatever, that all of the participants in the search had signed something saying that they had read the affidavit? Correct. And it turned out there was no such document? Actually, I think that's slightly wrong, Your Honor. The pre‑search documentation said that there was going to be a pre‑search briefing at which, you know, they would get copies of the warrant. The testimony was that they got copies of the warrant and of the affidavit. So what the magistrate concluded was that that was questionable because it wasn't set forth in that pre‑briefing document, that's all. But there was no contrary testimony to rebut the agent's testimony that these, that 35 to 40 copies of the affidavit were brought to the search. There was also a seizing agent whose exclusive function was to review every document brought to him by the searching agents to determine whether it was within the scope of the warrant. Agent Raftery and Agent Sullivan, who was the other supervising agent, both had given their cell phone numbers to all of the searching agents before the search took place for the specific purpose of making sure if they had a question about whether an item fit within the scope of the warrant, they could be called and asked about it. And Agent Raftery testified that that's, in fact, what happened, that she fielded ‑‑ Despite the presence of a search agent and all of these precautions, there were documents seized that were not responsive to the warrant, correct? That's correct, Your Honor. There were over 300 boxes seized, actually, by one count, over 500 boxes. And in the supplemental affidavits filed by the individual defendants, I believe there were seven items taken. And that is attributable to agent error as opposed to overbreadth. And I think that's a reasonable amount of documents in a, in a search of this scope that would be swept in by mistake. And that doesn't reflect any bad faith on the part of the agents. Is it the government's position in this appeal that if there are problems with some categories but not with others, that the problematic categories can be severed off? I believe that they can, Your Honor. We took the position in district court that we prefer it be all or nothing. But that was because if, if the district judge was to adopt the findings of the magistrate, it would have been very difficult to segregate out some documents from others from category 10. Can you show me in your brief where you argued severability? We didn't argue severability in the brief, Your Honor. Have you waived it? I, I don't think so, Your Honor. I think Don't argue it. It's, you still haven't waived it? Well, we did argue it below. We haven't argued it here. Arguably, it's waived for that reason. Okay. You know, we would, we would ask you in the interest of justice to address severability in your analysis if you find that there are some categories that don't fulfill probable cause requirements under the Fourth Amendment. In assessing the good faith of Agent Raftery, I, I want to remind the court that the suppression doctrine is designed to deter police misconduct, and in this case, I can't identify any misconduct to deter. And I, and it's a fact-intensive inquiry, and I'd just like the court to recognize that what the agents did in this case was extraordinary. There was a 34-page affidavit reviewed by the supervising agent's supervisor and that supervisor's supervisor, by a separate FBI supervisor, by an IRS tax criminal attorney, and by AUSAs in two different offices. The magistrate reviewed that affidavit for over two hours, made changes to it which were incorporated, and then there was the pre-search briefing that I mentioned before. And in all of that process, no one identified the fact that there were categories utterly unlimited as to time? No, Your Honor. And, and I think part of the reason for that is as you look at the descriptions in the affidavit, you'll see that SDI's corporate headquarters at the place search was opened in March of 1999, if I'm recalling correctly. SDI became the entity it is in 1998, and the billing records from the insurance companies indicated that the fraud went back to at least 1998. So under that analysis, there was at least a fair probability that any document seized from SDI would be within the time limitations of the fraud. Documents relating to accounting records? Yes. No time limitation, no subject matter limitation, just documents relating to accounting records? Well, a couple of points there, Your Honor. First, that's distinguishable from the cases that say that's overbroad, because those cases said simply documents or business documents. These are related to accounting records. SDI's fraud took two forms. It was polysomnographies and cardiac risk assessments. Both of those were billed to third parties, and all of those billing records were documented. All of those billing records are going to be accounted for in accounting documents. And remember that there's also an understatement of revenue tax count involved in this case, both corporate and individual. So only by looking at the accounting records are you going to find that evidence. And as we allege, this is a very widespread fraud, which infects the only two types of services that SDI bills for. So I would expect virtually all of the accounting records to reflect some evidence of fraud, and remember under Gates, it's simply the fair probability standard. We don't have to guarantee. I know he's over time. Can I ask one more question? Sure, sure, sure. I noticed that a couple of the categories asked for non-privileged documents. Yes. Was there anyone on site, including the search officer, qualified to make that determination? As soon as it became apparent that there were privileged documents, the search as to those was stopped. And a taint team was brought in from an FBI field office. And those two agents were qualified to make that determination. Those were sealed. They were not seized. How were they qualified? Actually, I think it was two attorneys. It wasn't two agents. So they should have an understanding of privileged documentaries. Thank you. You're welcome. Thank you, counsel. We'll hear now from the appellees. Good morning, your honors. May it please the court. My name is Lance Echeverry, and I'm appearing on behalf of the appellees in this matter. Judge Echeverry. Your honors, I stand before the court in an admittedly unique situation. It isn't often that defense counsel appears before the court following an order by the chief judge of a federal district in which the judge found the government's intrusion onto defendant's Fourth Amendment rights to be so pervasive that an order of total suppression was warranted. In this case, the unrebutted factual record in this case we submit mandated nothing short of that conclusion. In this case, you had a search warrant that contained 24 broad categories of documents to be seized that the district court found provided, quote, no guidance in limiting the search. Before we get into the warrant and the breadth and that sort of thing, can we start withstanding as your opponent did? Absolutely, your honor. The Supreme Court has told us, for example, that if that a divorced spouse doesn't have standing, that a tenant living in an apartment building doesn't have standing. Would the, under your theory, if there was a nationwide search of Microsoft offices, would the president or CEO of Microsoft have standing to complain about Fourth Amendment violations in all of those searches? Once again, your honor, I think we need to focus that on facts that are analogous to this case. Here, and as the court properly pointed out before, this case is really on all fours with Gonzalez. In both of those cases, you had an entity that had multi-state operations. Gonzalez did, SDI did. The search took place in the main offices of the two entities. Both were small main offices, housing less than 50 employees. And in that circumstance, just like the Supreme Court has found, owners and operators of a business have reasonable expectations of privacy in the entirety of their business premises. Even as the documents prepared for the purpose of being viewed, and in fact viewed by third parties? The answer to that is yes, your honor. Once again, the Fourth Amendment analysis is set forth by the Supreme Court in Minnesota versus Olson. Looks at the reasonable expectation of privacy in the premises. And once again, in Gonzalez, while the government has said yes, that was a wiretap case. This court made perfectly clear that the Fourth Amendment analysis for standing purposes was exactly the same. It's what is the reasonable expectation of privacy in the premises itself? There, this court found that the owners and operators of this business, who had control over the daily operations of the business, just as defendants Kaplan and Brunk did here, had sufficient expectations of privacy in the entirety of the premises. And that included telephone conversations that were taking place among employees in which the owners and operators weren't actually a party. And this is not a novel theory. In fact, the Supreme Court and this court have long held that owners and operators of businesses have such privacy rights in the entirety of their business premises. And the government cited to the Supreme Court's decision in Marshall versus Barlow's. And interpreted that based on the overruling of the co-conspirator exception in United States versus Padilla. To now stand for the proposition that owners and operators only have privacy rights in those areas over which they have exclusive province. Their offices, their desks, and not in other areas that may be open to other employees. But we also have cases that say if the executive doesn't have an independent proprietary and corporate document, how do we treat those cases in light of the cases that you're now arguing from? Well, Your Honor, first of all, this circuit has not held that with respect to owners and operators of a business. There you're talking about United States versus Gonzales, and that's on all fours here. We're also talking about Marshall versus Barlow's by. Maybe all threes. Excuse me? Maybe all threes. Okay. It is a wiretap case. It is a wiretap case. But again, Your Honor, this Court made very clear that the analysis in a wiretap case is precisely the same. It's what were the extent of your Fourth Amendment rights in the premises themselves. And Marshall versus Barlow's dispelled any notion that having access to certain areas by employees somehow negates the privacy rights of the owners and operators. Here's what the Supreme Court had to say, quote, the owner of a business has not, by the necessary utilization of employees in his operation, thrown open the areas where employees alone are permitted to the warrantless scrutiny of government agents. That's precisely the situation we have here, Your Honors. In fact, that appears right after the sentence that counsel for the government cited. And this wasn't a novel concept. In fact, this was precisely the ruling of the Supreme Court a decade before in Mancusi versus DeForte, where again. Well, how do you figure this out between a family-run business and some other enterprise which is privately held, not a public stock company, in which one or two individuals hold controlling interests? Because these can range, as you know, from a family-run business to a huge, almost global enterprise. Right. What are the fact, what do we look at? Gonzales doesn't really tell us much, except what it tells us about Gonzales's case. Well, actually, Your Honors, I would point, Your Honors, to the end of the Gonzales opinion, because I think they tied in this very point and addressed this specific issue when this Court said, short of being, quote, hands-off executives of a major corporate conglomerate, an owner and operator of a business has a reasonable expectation of privacy in the entirety of the business premises. That's exactly what we have here, Your Honors. This case, SDI, is on all threes, as Your Honor pointed out, with Gonzales. This is not a major corporate conglomerate. These are hardly hands-off executives. In fact, the undisputed record evidence in this case shows that just as in Gonzales, Defendants Kaplan and Brunk had near-plenary control over the day-to-day operations of this business. They were able to regulate who had access to the premises, implement security measures. And it was that type of control that this Court found dispositive in Gonzales. Let me ask you this. You've properly focused on Gonzales. It appears to be the extant law in the circuit. But the Gonzales panel relied, in part, on a particular statute that said any aggrieved person in any trial before any court may move to suppress the contents of any wire or oral communication, blah, blah, blah, blah, on the grounds that the order of authorization or approval under which it was intercepted is insufficient on its face. Isn't that a particularized congressional conferring of standing related to wiretaps that perhaps sets this apart? Your Honor, I don't believe it does, because once again, this Court in Gonzales was very careful to point out that the operative analysis here was whether the owners and operators of the business had reasonable expectations of privacy in the premises themselves. In other words, as it cited to the case in Alderman, the operative analysis for purposes of that case was not sufficient. Another wiretap case. Excuse me? Another wiretap case. That's correct, Your Honor. But what Alderman said is that the operative analysis in that case is whether the owners and operators of the business have Fourth Amendment privacy rights. And so it's engaging in precisely the same analysis that we have here. Counsel, we're dealing with a spectrum. Some are protected. Some go beyond. And what I'm looking for is some sort of a principle that could be applied here. Why should Gonzales apply to Mr. Kaplan and Burke, I think, in your case, but not to a larger office, in which case what's the dividing line? Is it 60, 80, 100? Is it a question of how big the bullpen is, that sort of thing? Give us a principle that we could apply here. Your Honor, there's no question that you've put your finger on a difficult thing for courts to answer, which is when is it enough like Gonzales and not at all like the major corporate conglomerate that the panel in Gonzales was pointing out. And I think the bright-line test, and it's really what I think the Court found dispositive in Gonzales and the courts generally have looked at, is the degree to which the defendants have control over the premises. That is the guiding light here for the Court. Because What does that do to the outlying building issue? I'm sorry, Your Honor, I didn't hear the question. What does that do to the off-site storage facility issue? Once again, I think we need to keep in perspective what that building is. The government suggests that Defendants Kaplan and Brunk should have been shown to visit this facility regularly if they're going to assert privacy rights in the premises. But again, this isn't a main office. This is a place where documents are stored. And there's nothing in Fourth Amendment jurisprudence that would require the defendants to regularly visit the storage facility just to make sure that boxes of documents don't move. Again, it goes to the issue of control. And here Well, and then I have the problem in terms of your principle. Sure, they have control in the sense they probably have a key, but they're not hovering around there on a regular basis. The It's remote. Help us on this. Sure. And I do think it goes down to the control factor, Your Honors. This is a locked storage facility. By virtue of them having the key, having the rights to use this premises and the rights to exclude others is all that this Court and the Supreme Court have found necessary in asserting privacy rights over warehouse facilities. For example, in C v. City of Seattle, the Supreme Court said by virtue of the fact that the owner of this warehouse was able to exclude the public, he had a reasonable expectation of privacy. This Court did the same thing. Was that an administrative search or a Yes, that was actually an administrative search in that case. And in the case, which I don't think creates a distinction, and quite the contrary, I would say that the privacy rights, as the courts have said, in connection with criminal searches, there's even a higher expectation of privacy and a higher protection of Fourth Amendment rights. But this Court in United States v. Johns did precisely the same thing. There was a case where defendants were found to have a privacy interest in a rented storage unit simply by virtue of the fact that they were the renters of the unit, the public didn't have access to it, and they had a right, they claimed a right to the materials that were stored therein. Once again, there was no finding by this Court that they were there every day or that they had to be there every day in order to assert that privacy right. Once again, it's the control factor, and we've got that here both with respect to the main office and with respect to the off-site storage facility. Roberts. Your Honor, going to the issue of particularity and overbreadth, the government has assigned error to what the district court did by attacking the district court for not sort of separating out this notion of particularity and breadth, as if those are two mutually exclusive analyses. Your Honors, they're not. As this – as the Court has repeatedly found in this circuit, where a warrant lacks sufficient particularity on its face, and as a result of that, you have, as in this case, a wholesale seizure, as the district court found, of the business records, precisely the type of general search and seizure that the Fourth Amendment prohibits, you have not only a particularity problem, but you also have an overbreadth problem. And that's precisely what we have here, where the lack of particularity you know, the problem I have with that argument is if I say in the warrant, you can go into the building, and you can seize every piece of paper, every computer document, and anything related to those, well, certainly the first two things aren't unclear. They're not lack of particularity. You can seize every piece of paper and every computer document. So it means I know what I can get. The question really seems to me to be separate. Is that justified? And it may be in some cases, you know, maybe the business is this big, and they do one little thing, and the only thing they've done is what they're indicted on. So it seems to me you have to get to the first question first. And what bothered me was it seemed like the district court and the magistrate were kind of going at it backwards. So, for example, let's just take accounting records as an example. With respect to particularity, is it your view that an agent wouldn't know sufficiently what accounting records are, and therefore that is not particular? Or is it your contention that really what you're saying is that all accounting records, really, there's not probable cause to take all accounting records? I think it's a combination of the two, Your Honors. And I think what the Court needs to keep in mind is this Court has said repeatedly that short of a business entity being permeated with fraud, generalized seizures of business records are not acceptable. And so to go back to Your Honor's example of the accounting records, what our argument is, is not that accounting records can't be identified, just as in all of the cases where this Court has stricken down general warrants, the phrase documents could be interpreted or documents relating to a certain idea could be distinguished from an e-mail. The issue here is there are no limiting factors on these categories. And here at a broad minimum, there are certain limiting factors that should have been on these categories instead of just opening up the entire business. So it's related to really not having probable cause to search the entire business, doesn't it? Well, Your Honors, that's what occurred in this case. You've got the other one. Right. But it's not because I can't go in there and figure out what accounting records are. It's because all the accounting records are really may or may not be relevant sufficiently or even a fair probability of relevance to the claimed criminal charges. That's correct, Your Honor, but that's precisely the situation that we have in this case, where you've got a wholesale seizure and the district court found as a factual matter that many of the documents seized here had no relevance to the people, the entities, or the subject matter under investigation. And so consistent with this Court's rulings about the need for limitations on the face of warrants, you've got issues where at a minimum, at an absolute minimum, this warrant should have been limited, and these categories should have been limited by date ranges. And the absence of that information gave agents license. Should have been limited by what? Date ranges. Oh, date ranges. I'm sorry. I couldn't. The absence of that information on the face of this warrant gave agents license to seize documents from long before SDI was even in existence. That's in the record. And also from the time that SDI opened its doors in 1994 until the time of 1998, when the government first says that's the first date that appears on the face of the affidavit, it's even suggesting there may have been a health care fraud. The absence of date ranges – In your view, if you look at all the list of 24 things, is there any business record that's not included in that list? Your Honors, no. And I think that's why we ended up in precisely the same situation that this Court addressed in United States v. Cal. These broad categories of documents, when taken together, really sought to describe everything that was on the premises. The seizure did precisely that. The undisputed factual record is more than 90 percent of the paper records were seized, 100 percent of the electronic files, only to have the government concede that more than 60 percent of that was wholly irrelevant to both the investigation and to this case. By definition, this has exceeded the scope of what the government was entitled to do, and it goes contrary to all of the opinions of this circuit saying you need to have limitations. The Fourth Amendment does not permit the government to go in and engage in the type of exploratory rummaging that they did here. In addition to date ranges, we've got at least, at a minimum, a limitation by reference to the criminal activity, the absence of which here caused agents to seize documents that had nothing to do with the health care industry, simply because they had no context for this search. At a minimum, it should have listed the entities, the specific entities on the premises that were subject to search, once again, the absence of which caused them to seize documents with respect to entities that had nothing to do with SDI, M&T Marketing, the Transcription Institute, Supplies Direct, which was an office supplies company. These were not even part of the government's investigation, yet the lack of limitations on the face of the warrant caused all of that to be fair game. And that simply cannot jibe with this Court's repeated opinions. Let me address very, very briefly the last two prongs, the cure-by-affidavit rule. While we recognize there don't need to be any magic words or phrases, that's what United States v. Vesicuru teaches us, the preprinted search warrant form here, which made some scant references to the affidavit, really did nothing more than advise agents that an affidavit existed and that the affidavit contained some of the facts on which the government found probable cause. Now, let's think about what the government is doing here. This Court in Bridges said that specific language wasn't good enough for incorporation by reference. But let's think about what the government is doing here. They're essentially arguing that every time this same preprinted form is used by any U.S. attorney's office across the country, there will be incorporation by reference. And so effectively, you'll eliminate the requirement to state with particularity any of the items to be seized on the face of the warrant. Your Honors, I see that I've got about ten seconds left, and I'd just like to conclude by saying this is not one of the situations we would submit where the Court should look to good faith. In fact, each of the good faith justifications given by the government have been specifically rejected by this Court, or that you should attribute some kind of excusable neglect to the wholesale seizure of documents in this case. And it's only through an order of total suppression that a clear and unmistakable guideline can be given to the government that this type of exploratory rummaging, the lack of particularity on the face of the warrant, and the kind of unconstitutional overbreath here will be tolerated. Thank you. Thank you, counsel. Your Honors, I beg your pardon. May I briefly just correct a misstatement that I think I made during my argument? You may do so. Your time has expired in terms of argument, but you may certainly do that. I'm afraid that I misinformed you about one point, and that's why I asked to be heard. Sure. Go ahead. Judge Hawkins asked me about the taint team that was brought out, and I thought that they were agents, but the testimony doesn't make clear whether they're IRS agents or attorneys. I can't tell from reading the transcript, and I don't want to mislead you and say that they were attorneys. I don't know that they were. And I refer you to pages 189 of the excerpts and forward for the next two. There's discussion of the taint team, but not of who they were. Thank you, counsel. Thank you for your time. The case just argued will be submitted for decision, and the Court will adjourn. Thank you.
judges: O'scannlain, Hawkins, McKeown